[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
In this action the plaintiff seeks a dissolution of marriage and ancillary relief. Both parties were represented by counsel throughout the proceedings and testimony was received from both parties. In addition to the issues presented at the dissolution there were three pendente lite motions which were the subject of an evidentiary hearing on September 21, 2001 (heard by another judge), as follows:
Motion No. 131.10 — Defendant's motion for contempt and counselfees.
On September 21, 2001, the plaintiff was found in contempt for violating the automatic orders by disposing of marital assets and by failing to pay support, alimony, unreimbursed medical and pre-school expenses and failing to provide medical insurance. He was ordered to pay the plaintiff the sum of $7,175, $1,000 counsel fees, and to provide the ordered medical insurance, all within twenty days. The Court then continued the question of [additional] sanctions to the time of trial.
Motion No. 132. Defendant's motion to modify pendente lite orders forchild support. alimony, and other extra curricular activities of theminor children. and counsel fees associated with the bringing of themotion.
The Court deferred this motion to the time of trial for determination by the trial judge.
 Plaintiff's motion for modification of pendente lite orders for alimonyand child support.
This motion was also deferred to the time of trial for determination by the trial judge.
 Jurisdictional Findings
The parties intermarried on August 12, 1990 at Vernon, Connecticut. The defendant's birth name was Charlene Estell.
Both parties have resided continually in the State of Connecticut for at least twelve months next preceding the date of the complaint in this action.
Neither party is receiving or has received aid from the State of Connecticut or any municipal subdivision thereof.
There are two minor children issue of the marriage of the parties:
CT Page 15665 Ellerie Lauren Field, born May 20, 1996 Evan Glenn Field, born February 17, 1999
There are no other children born to the defendant during the marriage.
 Additional Factual Findings
The husband is 37 years of age and the wife is 39 years of age. Both are in good health. The husband has four years of college (but no degree) and the wife has approximately one year of hair dressing school post high school, and an adult education course in business practice.
At the time of their marriage the defendant was working as a hair stylist, for a time in her own shop and later as an employee in another shop. In the fall of 1998 (prior to the birth of their second child), she left that employment to become a homemaker.
In 1990 the plaintiff was working for Linc Systems. Linc Systems provided consulting services in developing software programs and systems for corporations and business entities, not unlike services and programs offered by Microsoft. During the decade of the 90's, he co-founded several companies for the development of software programs servicing a corporate clientele. These included Open Solutions, Inc. (OSI), which designed and developed systems primarily in the banking industry; PRISM Client Server Group and Shoreline Software (Shoreline). The plaintiff's income in 1999, as the owner of Shoreline, was approximately $130,000. In the beginning of 2000 Shoreline was acquired by Versata or, in actuality, it had ceased to exist, and the plaintiff, along with several Shoreline employees went to work for Versata. According to the plaintiff Shoreline had very little in material assets, and its true value was its employees and especially the plaintiff himself. Shoreline's major client was the United Illuminating Company and when that company indicated it would no longer be utilizing the services of Shoreline, the plaintiff went over to Versata still providing the same type of technical expertise in that position.
Versata gave the plaintiff a $200,000 signing bonus and his title with that company was Senior Director of e-business solutions, his salary was to be $135,000 per year plus bonuses. He was expected to develop so-called "high-end" accounts especially on the east coast. While employed at Versata, the plaintiff's life-style can fairly be described as extravagant. The principal of the company wanted its executives to exude the appearance of wealth and success. The plaintiff was expected to dress fashionably and he spent over $40,000 for suits and clothing, and while the company reimbursed him 50% of clothing expenses, he spent an inordinate amount of his own money. His monthly expense account was in CT Page 15666 the neighborhood of $20,000 to $30,000 including travel and entertainment. It was expected that Versata would go public, and the plaintiff expected that when it did, he would exercise his stock options (at least 25,000 shares) and, because a company's stock typically dramatically increases in value when it goes public, he would make as much as eight million by profit taking.
The plaintiff's dreams and expectations, however, never happened. Versata went in to a major financial slump. It did not go public, and in January 2001 had to reorganize and reduce its workforce. The plaintiff's position was eliminated and he was terminated as of January 15, 2001. He received a severance payment of $100,000. After taxes, however, he received $54,000. He testified that Versata probably owed him some $60,000 for expenses he advanced before he was terminated so the $100,000 was not truly salary. Although he protested to Versata that they deducted taxes on the full $100,000, Versata deemed it to be all salary and not a partial reimbursement for expenses. In any event he did net $54,000 from that final payment.
Toward the end of February 2001 he obtained employment as the Chief Operating Officer of a company called WEB/EKG, which is located in Florida. His salary at WEB/EKG was $120,000 per year. He was terminated from that job on July 3, 2001 during a company-wide layoff caused by poor economic conditions.
He has made reasonable and appropriate efforts since then to obtain employment commensurate with his ability and experience, but, probably because of prevailing economic conditions, has not been successful. Although he continues to work with recruiters, he is taking classes in Florida which would enable him to get a real estate broker's license there. He expects to become part of a real estate venture by the end of 2001, which will be in the business of selling high-end real estate. According to his testimony, he expects to be earning a salary similar to his previous earnings — that is approximately $125,000 to $130,000 per year — after six months or so in the real estate venture, and suggests even in the high six figures after one to one and a half years.
In the meantime, however, he has no reported income shown on his financial affidavit and lists liabilities of more than $200,000, which include estimated income taxes for the years 1997 through 2000 of $160,000, attorney's fees of $31,000 and family loans of $12,625.
It is difficult to understand how the plaintiff can do some of the things he does or has done with zero income. For example, he flew from Florida to Connecticut for this hearing. He is (or was) paying someone $1,000 per month to be his driver. (His driver's license is under CT Page 15667 suspension until February due to an operating under the influence). At the September hearing he testified that he is paying $1,000 per month for rent while his roommate was contributing nothing to this expense. (At the trial in November, he testified that he had been evicted and was living rent free in a friend's house). On the other hand, in his proposed orders he asks that child support be computed on income of $30,000 per year, yet does not indicate he has any income at all. The Court has some reservations about the actual state of his finances.
He has a term life insurance policy with no cash value and the only assets he has are his half interest in the marital home, (one half the equity is between $21,500 and $30,000 depending on which financial affidavit reflects the more accurate mortgage balance), and 50,000 shares of OSI stock with an estimated present value of $3.00 to $5.00 per share.
The defendant wife has been a homemaker since 1998. The minor children are now five and two years of age, and would require day care if she were to work outside the home. Her only source of income is the ordered support and alimony of $3,300 per month.
It has been determined that the plaintiff violated the automatic orders applicable to divorce cases. In part those orders prohibit disposing of any property held by the parties, whether individually or jointly, without agreement or court order, except in the usual course of business or for customary and usual household expenses. For example at the earlier contempt hearing it was found that he paid a Richard Ryan $58,000 which he testified was a private loan, out of his $200,000 signing bonus. (There was no documentary evidence corroborating such a loan). He spent extravagantly for clothes, he traded in his Corvette and Tahoe vehicles and was paying $900 per month to lease a new Tahoe. He cashed in a standard life insurance policy, receiving $11,000, and obtained a term policy. He paid $6,700 for a hot tub and $3,000 for a pool table. He lent $5,000 to a friend (Stacy). He testified that to the extent he violated the standing orders, it was not done with malice but because he expected to make a high salary at least, and millions at best, through stock trading. That misses the point, however, because the purpose of the automatic orders is to preserve marital assets for distribution at the time of dissolution. The plaintiff's actions have seriously impacted that goal.
Additional findings will be set out as needed to explain the orders to be entered and as they relate to Connecticut General Statutes § 46b-81
(c) and 46b-82. These include the length of the marriage, the causes for the breakdown of the marriage, the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, CT Page 15668 liabilities and needs of each of the parties, the opportunity of each for future acquisition of assets and income and the contribution of each of the parties in the acquisition, preservation, or appreciation in value of their assets. Many of these factors are applicable in the determination of alimony, but, in addition to those, the desirability of the primary custodial parent securing employment, and the amount of support awarded.
This is an eleven year marriage with two young children issue. The plaintiff claims that Mrs. Field is an unhappy person and that her unhappiness "wore him down." The defendant claims that Mr. Field was inconsiderate, that he wanted to be out too much with his friends for sports events, golf vacations and other activities. It would appear that each had different expectations and obligations about what their relationship entailed. His life style was one of a high-living go-getter while hers was far more mundane as a homemaker. While there was no evidence of abuse or proof of the existence of marital affairs which would more clearly establish fault, it would seem that the plaintiff could have been more understanding of the defendant's needs. She, on the other had was very supportive of the plaintiff when he was founding his businesses. Initially, before he rented office space she would have his business associates in their home, at times twelve to fourteen people. That went on for over a year. In the plaintiff's own words, "she [Charlene] was extremely supportive of everything that we tried to do. We had a lot of guests in and out of the house all the time. She accommodated them when she wasn't you know, working as far as providing any support that we needed. She didn't do any physical labor towards . . . in a position in the business, but she provided a lot of support. We couldn't have done without her help." She is also entitled to be credited for maintaining the family home and being the primary care giver for the minor children. O'Neill v. O'Neill, 13 Conn. App. 300, 308 (1988).
The Court does not believe it would be practical for the defendant to seek employment outside the home at this point in time. Her earning capacity is, at best about $35,000, but with two very young children at home she would be unlikely to put in the hours necessary to earn that amount. She also testified that nights and Saturdays are the peak hours for hairdressers and day care is least available at those times. She also testified that full time day care for weekdays would be about $250 per week for the two children, but once they are in school, part-time after school day care would be about $100 per week. Her earning capacity is far more limited than the plaintiffs and it makes sense that she stay at home with the children at least until they are in school full time. There is also the intangible benefit to the children from being with their mother during their very young years. There was testimony that Ellerie required some therapy when her father left the home although she has been okay for the past year or so. CT Page 15669
Without doubt, the plaintiff has far more in vocational skills and opportunity for much greater income than the defendant in the future. From his own testimony he expects to be earning close to his past earnings of $125,000 to $130,000 within a relatively short period of time after the real estate venture gets off the ground and then into the high six figures.
The plaintiff estimates he owes federal and state taxes of approximately $160,000 for the years 1997 through 2000 and lists debts to attorneys of $31,000, and debts to family members of $12,625.
The defendant's liabilities include attorney's fees of $35,000 and credit card debt of nearly $8,000.
With this factual background, the Court now turns to the several pending motions and orders to be entered as part of the dissolution.
 1. Defendant's motion for contempt and counsel fees (No. 131.10).
 The defendant has purged himself of the contempt by complying with the orders entered by Judge Graziani on September 21, 2001, the Court will not impose any additional sanctions. (The purge figure included $1,000 in counsel fees awarded at the September 21st hearing). It is noted, however, that the plaintiff, as of November 7th, has not paid any portion of the pendente lite payments due for October and November.
 2. Defendant's motion for modification (No. 132) and counsel fees, pendente lite.
 The Court will address the requests made in this motion in its dissolution orders and it is not necessary to rule on this motion.
 3. Plaintiff's motion to modify [alimony and child support] pendente lite. (No. 135).
 This motion is denied. The plaintiff, by his own testimony expects to be earning a six figure income within a few months. While it is true that he did not voluntarily leave his last employment, it is also true that he has dissipated considerable CT Page 15670 assets as discussed above, thus his state of finances or lack thereof was, in large part, self inflicted. Under these circumstances it seems inequitable to this Court to place the burden of supporting the minor children on the defendant, which would inevitably result in her going deeper into debt, with far less ability to recover in the future. Any accrued arrearage will be relatively insignificant based on his own earning expectations.
 Orders 1. The Court finds the marriage between the parties has broken down irretrievably and grants the decree of dissolution on said grounds.
 2. In accordance with the stipulation of the parties, custody of the minor children of the marriage shall be joint with primary placement being with the defendant mother, subject to reasonable rights of visitation in the plaintiff father presently as such visitation is determined by the guardian ad litem, Dr. Leslie Strong, in accordance with the order of the Court before Steinberg, J., December 11, 2000, as said order may be subsequently modified.
 3. Based on the plaintiff's earning capacity of $120,000 per year, he is ordered to pay child support of $1,755 per month. He shall, in addition, pay 73% of unreimbursed medical expenses for the minor children and the defendant shall pay 27% of said expenses. Those orders are in compliance with Connecticut's support guidelines.
 4. The plaintiff shall pay alimony of $1,800 per month through December 2006. This will allow the defendant to remain at home with the minor children until they are in school full time and a reasonable time thereafter to enter the workplace and reach her earning potential. Recognizing, however, that the plaintiff's income is temporarily limited, the Court will suspend the amount of alimony in excess of $1,000 per month, which said excess, however, shall accrue as an arrearage, until the payment due CT Page 15671 on February 1, 2002. Beginning in February 2002, the plaintiff shall pay, in addition to the $1,800 monthly alimony, the sum of $500 per month against any alimony arrearage. This arrearage shall include any prejudgment arrearage of support and alimony, specifically including, but not limited to payments due for October and November 2001. Said periodic alimony shall sooner terminate on the defendant's remarriage, or the death of either party, whichever first occurs.
 5. The plaintiff shall quitclaim to the defendant, all his right title and interest in the jointly owned marital residence known as 330 Merline Road, Vernon, Connecticut and she shall hold him harmless from any debts and expenses related to said property.
 6. The defendant shall be entitled to 60% of the OSI stock as long as the value of said stock does not exceed $10.00 per share. If said OSI stock exceeds $10.00 in value the defendant shall be entitled to 50% of the value of the stock. The plaintiff shall execute any documents effecting the transfer of ownership of said stock, or any documents required to show he is holding said stock for the defendant's benefit. The defendant shall determine whether she want her share of the OSI stock transferred to her, or held for her benefit.
 7. If either party has failed to disclose any assets at the time of this judgment, that party shall pay 65% of the value of that asset at the time of judgment, to the other party, plus interest of 10% from the date of judgment to the date of discovery.
 8. The plaintiff shall maintain the current health insurance in effect for the minor children through the Golden Rule Plan, and he shall continue said coverage for the benefit of the defendant through February 2002. He shall, however, maintain said health insurance for the minor children. In the alternative, if he has health insurance through his employment he may utilize that coverage instead. CT Page 15672
 9. The plaintiff shall assume and hold the defendant harmless from any tax liabilities due on federal or state taxes for either personal or business tax returns which were filed jointly by the parties, individually by the plaintiff, or on behalf of any business owned by the plaintiff.
 10. The plaintiff shall assume and hold the defendant harmless from any liability associated with any litigation against the plaintiff or any of his business dealings.
 11. Unless otherwise provided herein, the parties shall be responsible for the debts shown on their respective financial affidavits.
 12. The defendant shall solely own the 1999 Buick automobile and shall be responsible for all debts and expenses related thereto.
 13. The defendant shall have the option to exercise COBRA rights for health insurance after February 2002 through the Golden Rule Plan presently being provided by the plaintiff, at her sole cost, if such coverage is available through the carrier.
 14. The plaintiff shall maintain his present life insurance naming the defendant as irrevocable beneficiary for as long as he has any financial obligation to the defendant.
 15. The plaintiff shall be responsible for filing federal and state tax returns for the years 1999, 2000 and 2001, which returns may be joint or not, depending on the recommendation of the plaintiff's accountant, and the defendant shall cooperate in providing any needed information on a timely basis, provided that any such filing method elected shall not result in a greater tax liability to her.
 16. The plaintiff shall pay $5,000 towards the defendant's counsel fees within one year of judgment.
 17. The plaintiff shall provide bi-monthly reports in CT Page 15673 the form of sworn affidavits, which state his place of employment and include a copy of all employment agreements, salary/benefit information (including reimbursable expenses), for a period of six months.
Klaczak, J.